PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

v.

EVERETT OSHAE BROWN,
*Defendant-Appellee.*

No. 04-4353

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Raymond A. Jackson, District Judge.
(CR-04-003)

Argued: December 2, 2004

Decided: March 25, 2005

Before WILKINS, Chief Judge, and NIEMEYER
and DUNCAN, Circuit Judges.

---

Affirmed by published opinion. Chief Judge Wilkins wrote the majority opinion, in which Judge Duncan joined. Judge Niemeyer wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Michael James Elston, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. Larry W. Shelton, Supervisory Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia, for Appellee. **ON BRIEF:** Paul J.

McNulty, United States Attorney, Alexandria, Virginia, for Appellant. Frank W. Dunham, Jr., Federal Public Defender, Frances H. Pratt, Research and Writing Attorney, OFFICE OF THE FEDERAL PUB-LIC DEFENDER, Norfolk, Virginia, for Appellee.

---

## OPINION

WILKINS, Chief Judge:

Everett Oshae Brown was charged with possession of a firearm by a convicted felon, *see* 18 U.S.C.A. § 922(g)(1) (West 2000). The United States appeals a decision of the district court suppressing a firearm discovered in Brown's back pocket as well as statements made by Brown following his arrest. Because the officers lacked sufficient justification under the Fourth Amendment to arrest and search Brown, we affirm.

I.

In September 2003, police in Newport News, Virginia, received an anonymous telephone tip that a short, black male with glasses was carrying a firearm outside the Roseman Court apartment complex. Two officers approached the scene: Officer C.J. Lewis in a marked patrol car and Officer Randall Petrosky on foot. Officer Petrosky was accompanied by a K-9 police dog.

Officer Petrosky was the first to arrive at the scene. When he arrived, Brown was standing on the sidewalk outside one of the apartments. Brown generally matched the description provided in the anonymous tip. As Officer Petrosky approached, Brown turned and walked into the apartment. Through the open blinds of the apartment window, Officer Petrosky could see people in the apartment telling and motioning for Brown to leave.[1] Brown left the apartment and walked out onto the sidewalk.

---

[1] It does not appear that Officer Petrosky could discern the words they were saying—*i.e.*, why they wanted Brown to leave the apartment. He could only observe that they were telling and motioning for Brown to leave.

By this point, Officer Lewis had arrived in a patrol car. She approached Brown on the sidewalk and asked, "Excuse me, can we talk to you a minute?" J.A. 103 (internal quotation marks omitted).[2] Officer Petrosky and the police dog were standing just behind her. Brown voluntarily and without prompting produced his Virginia identification card. Officer Lewis ran the identification through dispatch and returned it to Brown. The officers then told Brown that he matched the description of the anonymous tip. Brown responded that he was not the person for whom they were looking. Officer Lewis asked Brown if he would consent to a pat-down for weapons. Brown refused.

According to Officer Lewis, throughout the conversation Brown had "the strong odor of alcoholic beverage emitting from his breath, [and] his eyes were bloodshot and glassy." *Id.* at 50. Officer Petrosky agreed that Brown's eyes were "bloodshot and glassy" and added that he was "fidgety and nervous." *Id.* at 35. At one point, Officer Lewis asked Brown if he had been drinking that evening and Brown responded, "I'm going to be honest. Yes, I have." *Id.* at 51 (internal quotation marks omitted). Brown exhibited no other physical impairments, such as slurred speech or staggered movements.[3]

Based on the conversation with Brown and the impairments she observed, Officer Lewis testified that she decided to place Brown under arrest for public intoxication. Before she could do so, a fight broke out inside the apartment from which Brown had exited. Officer

---

[2]This was the district court interpretation of the inquiry, presumably based upon its synthesis of the testimony at the suppression hearing. Officer Petrosky described Officer Lewis' inquiry as "'May I speak with you?'" J.A. 38, though he "[could not] recall her exact words," *id.* at 33. Officer Lewis described her inquiry as, "I asked him if we could speak to him, which he consented." *Id.* at 50.

[3]At the suppression hearing, both officers testified that Brown's speech was slightly slurred. The district court refused to credit this testimony, however, because the officers had not documented the slurred speech in their contemporaneous arrest report. We find no clear error in this factual determination and assume for purposes of this appeal that Brown's speech was not slurred. *See United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997).

Petrosky called for backup to assist with the fight. Especially important to this appeal is the chronology of events that took place after the fight broke out. At the suppression hearing, Officer Petrosky described the ensuing events as follows:

> [Officer Lewis] told Mr. Brown to go ahead and place his hands on [a nearby] car. He started to bend over to place his hands on the car. When he bent over, I noticed in the pants that he was wearing, on the left rear pocket of his pants I noticed this bulge that was in the shape of a gun. So immediately to me I knew he had a gun in his left rear pocket.

*Id.* at 34. Officer Lewis' testimony supported this account: "For our safety, I asked [Brown] to place his hands on the car that was directly in front of him. . . . As he placed his hands on the car, I saw Officer Petrosky immediately draw his weapon and order Mr. Brown to keep his hands on the car." *Id.* at 51. At that point, Officer Lewis also drew her weapon and pointed it at Brown. Brown became very nervous and began to lift his hands up and down on the car. According to Officer Lewis, Brown then said, "'The weapon is in my back pocket. Just take it, just take it.'" *Id.* at 52.[4] Officer Lewis removed the firearm from Brown's pocket. Officer Petrosky ordered Brown to his knees, and one of the backup officers who had arrived placed Brown in handcuffs and into a patrol car.

According to Officer Lewis, during the car ride to the booking station Brown "was speaking pretty freely and just stated that someone in the apartment had told him to take this burn and bounce," which meant to take the firearm and leave the apartment. *Id.* at 53. Brown also stated that "the only reason he had taken the gun out of the apartment was because there were children present in the apartment." *Id.* at 54. At no point before Brown made these statements had the officers informed him of his *Miranda* rights, though Brown's statements in the patrol car were not in response to any police questioning.

---

[4]*Accord* J.A. 35 (testimony of Officer Petrosky that Brown stated, "'Just take the gun out of my pocket, just take the gun out of my pocket.'").

Brown moved to suppress evidence of the firearm and his statements in the patrol car as having been obtained in violation of, *inter alia*, the Fourth Amendment. The district court found that a reasonable person in Brown's position during his initial encounter with the police—faced with two uniformed officers, a police dog, and information about an anonymous tip—would not have considered himself free to disregard the police and go about his business. The district court concluded, therefore, that the initial encounter between the officers and Brown was a *Terry* stop, *see Terry v. Ohio*, 392 U.S. 1 (1968), not a consensual police-citizen encounter, and the officers thus needed reasonable, articulable suspicion that Brown was armed and dangerous to justify the stop. Citing *Florida v. J.L.*, 529 U.S. 266 (2000), the district court explained that the anonymous tip alone did not provide adequate suspicion because the tip contained no information predicting future acts by which the officers could corroborate the substance of the tip. Therefore, the district court ruled that the *Terry* stop was illegal and suppressed the firearm and statements obtained after the stop.

The district court ruled alternatively that even if the initial encounter between the officers and Brown was a consensual police-citizen encounter, not a *Terry* stop, the officers did not have probable cause to arrest Brown for public intoxication. Glassy, bloodshot eyes, the smell of alcohol, and Brown's admission that he had been drinking, the district court explained, were not sufficient under Virginia law to establish probable cause for the arrest. Evidence of the firearm and Brown's statements was therefore suppressed as fruit of the illegal arrest. This appeal followed.

## II.

Designed "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals," *INS v. Delgado*, 466 U.S. 210, 215 (1984) (internal quotation marks omitted), the Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (holding that the Fourth Amendment is incorporated and applied to the states by the Due Process Clause of the Fourteenth Amendment).

The Supreme Court has identified three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment: "(1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002) (citations omitted). Evidence gathered as fruit of an unreasonable search or seizure is generally inadmissible against a defendant. *See Taylor v. Alabama*, 457 U.S. 687, 694 (1982); *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963); *cf. Walder v. United States*, 347 U.S. 62, 64-65 (1954) (holding illegally obtained evidence admissible for purposes of impeachment). In the context of a motion to suppress evidence alleged to have been obtained illegally, "we review the factual findings of the district court for clear error and its legal conclusions de novo." *United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000).

A.

The first issue presented is at what point during the exchange between Brown and the officers was Brown seized, thereby triggering the protections of the Fourth Amendment. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citation omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). A number of circumstances inform the inquiry of whether a reasonable person would feel free to disregard the police, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.); *accord Weaver*, 282 F.3d at 312.

The district court reached alternative conclusions as to when Brown was seized. First, the court concluded that the initial encounter between Brown and the officers—during which Officer Lewis asked

Brown if they could talk to him, informed him that he matched the description of the anonymous tip, and asked if he would consent to a pat-down search—constituted a seizure which triggered Brown's Fourth Amendment rights. Alternatively, the court concluded that Brown was seized when Officer Lewis decided to arrest him for public intoxication and ordered him to place his hands upon an adjacent car. We examine each of these conclusions in turn.

1.

The district court first concluded that the initial encounter between Brown and the officers "amounted to a *Terry* stop, and not a consensual discussion between a citizen and police officers." J.A. 108. The court noted that two uniformed officers were present during the initial encounter, one of those officers had a K-9 police dog at his side, and Brown had not acted in "an unusual fashion to raise any suspicion of illegal activity," *id.* at 108-09. The court added that it was Officer Lewis' "resolute position that she intended to pat-down" Brown when she first approached him, and she asked Brown to consent to the pat-down "only because it is easier [to obtain] consent than to explain . . . the contours of reasonable suspicion." *Id.* at 109. "[I]n view of all the circumstances surrounding the incident," the court concluded, "a reasonable person would not believe that he was free to leave the premises." *Id.*

The Government argues that "[t]he facts found by the district court establish nothing more than a consensual police-citizen encounter that required no objective justification." Br. of United States at 8. It characterizes Officer Lewis' initial inquiry of Brown as a "friendly request for a word with [him]." *Id.* at 9. Among other facts, the Government emphasizes that Brown refused to consent to the pat-down search requested by Officer Lewis, which in the Government's view shows that Brown "believed he was free to refuse Officer Lewis's requests during the encounter." *Id.* The Government also asserts that the "resolute position" of Officer Lewis to pat-down Brown upon approaching him was irrelevant to the determination of whether Brown considered himself free to disregard the officers, *see Mendenhall*, 446 U.S. at 554 n.6 (explaining that officer's subjective intention to detain suspect is irrelevant in determining whether suspect believed

he was free to leave unless that intention was communicated to suspect).

We need not resolve whether the initial encounter between Brown and the officers was a *Terry* stop or a consensual police-citizen encounter, for our ultimate disposition of this case would be the same either way. Assuming that the initial encounter was a *Terry* stop, our conclusion below that the officers lacked reasonable suspicion to justify the stop warrants affirming the district court decision to suppress the firearm and statements. Alternatively, assuming that the initial encounter was consensual, our conclusion below that subsequent actions of the officers constituted an arrest without probable cause also warrants affirming the district court decision to suppress the firearm and statements. In either event, as detailed below, the firearm recovered from Brown's back pocket and his statements in the patrol car were fruits of an illegal seizure and therefore properly suppressed.

2.

In the alternative, the district court concluded that even if the initial encounter between Brown and the officers was a consensual police-citizen encounter, Brown's Fourth Amendment rights were triggered when Officer Lewis decided to place Brown under arrest for public intoxication and ordered him to place his hands on a nearby car. In its opening brief, the Government conceded that Brown was seized when "he was ordered to place his hands on the car, which is the point at which Officer Lewis had decided to arrest [him]." Br. of United States at 13. At oral argument, however, the issue was raised that Brown's actions *after* being ordered to place his hands on the car may have affected the point at which his Fourth Amendment rights were implicated. Specifically, rather than placing his hands on the nearby car and leaving them there, Brown leaned toward the car, placed his hands on the car, and then began "lifting his hands up and down, [and] did not want to keep his hands on the car." J.A. 52. Indeed, the officers, weapons drawn, had to order him repeatedly to place his hands on the car.

We are mindful of the general rule that a seizure "requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). A

defendant who flees the police in response to an assertion of authority has not been seized, and thus his Fourth Amendment rights are not implicated. *See id.* at 626, 629. Because no physical force was used against Brown until after the firearm was discovered, the critical inquiry here is at what point did Brown submit to the assertion of authority by Officers Lewis and Petrosky. We conclude that Brown submitted to the officers' show of authority when, at the officers' command, he first leaned over and placed his hands on the car.

Officer Lewis ordered Brown to place his hands on a car that was directly in front of him. In response to that order, Brown leaned over toward the car and placed his hands on it. When he leaned over, Brown's shirt (apparently a long, jersey-style shirt) lifted slightly and exposed the upper portion of his pants. It was at this point that Officer Petrosky first noticed the gun-shaped bulge in Brown's back pocket. Both officers then drew their weapons on Brown. Throughout the exchange, Brown was nervous and fidgety. He lifted his hands up and down, and he told the officers to take the firearm out of his back pocket. To be sure, by lifting his hands up and down, Brown may have suggested that he might stop submitting to the officers' assertion of authority and possibly attempt to flee the scene or confront the officers. However, that Brown lifted his hands up and down does not nullify the fact that he initially submitted to Officer Lewis' order by leaning toward and placing his hands on the car, and that submission led to the discovery of the firearm in his back pocket. Therefore, we agree with the district court that Brown was seized, and his Fourth Amendment rights triggered, at least as early as when he submitted to Officer Lewis' order by leaning toward and placing his hands on the adjacent car.[5]

---

[5]Our colleague in dissent asserts that when the gun was discovered, "the officers had only made a *request* that Brown place his hands on the vehicle for the officers' safety," and this "request" then "changed to a *command* only after one officer saw the gun and stated that he 'ordered' Brown to place his hands on the vehicle." *Post*, at 18-19 (emphasis added). While it is true that Officer Lewis testified that she "asked [Brown] to place his hands on the car," J.A. 51, 64, the entire record demonstrates that Brown did not have the option of refusing Officer Lewis' "request." Officer Lewis later described the event as follows: "I *told* Mr. Brown to please place his hands on the car because the fight was

### B.

We now turn to whether Officers Lewis and Petrosky had sufficient justification under the Fourth Amendment when they seized Brown. There are two potential sources of authority for the seizure. Under *Terry*, the officers would have been justified in stopping and frisking Brown if they had a reasonable, articulable suspicion that criminal activity was afoot and that Brown was armed and dangerous. *See Terry*, 392 U.S. at 27.[6] Alternatively, the officers could have properly searched Brown if the search was incident to a valid arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973); *Chimel v. California*, 395 U.S. 752, 762-63 (1969). We address each of these sources of authority in turn.

### 1.

First, we address whether Brown's seizure was proper under *Terry*. As noted above, we decline to resolve whether the initial encounter between Brown and the officers was a consensual encounter or a *Terry* stop, for in our opinion the ultimate resolution of the case is the same either way. This is in part because we conclude that at no point before Brown was ordered by Officer Lewis to place his hands on the car—*i.e.*, at no point before Brown was unquestionably seized—did

---

breaking out." J.A. 65 (emphasis added). Similarly, Officer Petrosky testified that Officer Lewis "*told* Mr. Brown to go ahead and place his hands on the car." J.A. 34 (emphasis added). And, Officer Petrosky's testimony demonstrates that he equates the word "told" with the word "ordered." *See* J.A. 35 ("I was still *ordering* him to place his hands on the car. Mr. Brown was becoming very nervous, he was kind of fidgety. I *told* him again to put his hands on the car." (emphasis added)). Moreover, both officers testified that Brown was under arrest when he bent over toward the car. *See* J.A. 40-41, 61. Indeed, the Government argued to the district court, in attempting to justify discovery of the firearm, that "although [Officer Lewis] didn't say the magic words 'you are under arrest,'" Brown "was under arrest; therefore, she had the authority to search him incident to that arrest." J.A. 73-74.

[6]Brown does not dispute that the officers would have been justified in conducting a pat-down if they had already garnered reasonable suspicion that he was in possession of a firearm.

the officers have reasonable suspicion to justify a *Terry* stop. *See J.L.*, 529 U.S. at 271 ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.").

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30). Though the quantum of suspicion necessary for a *Terry* stop is "less demanding than that for probable cause," an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27).

Here, Officers Lewis and Petrosky initially approached Brown in response to an anonymous telephone tip that Brown was carrying a firearm. An anonymous telephone tip that alleges illegal possession of a firearm but that merely identifies a suspect and his location does not itself provide reasonable suspicion for a *Terry* stop. *See J.L.*, 529 U.S. at 271-72, 274. To justify a *Terry* stop, such a tip must contain sufficient "indicia of reliability" to enable officers to evaluate the veracity of the tip before stopping whomever the tip identifies. *Alabama v. White*, 496 U.S. 325, 330 (1990). For example, an anonymous telephone tip sufficient to justify a *Terry* stop might predict a suspect's future actions, which can then be corroborated by police surveillance of the suspect's movement. Once the predictions are corroborated, police may have reasonable suspicion to make a *Terry* stop. *See id.* Or, police may be able to credit an anonymous telephone tip based on their experience in having received reliable tips from the same informant in the past (identified by the sound of the informant's voice), thereby justifying a *Terry* stop. *See J.L.*, 529 U.S. at 275 (Kennedy, J., concurring).

Here, the tip provided nothing more than a brief, general description of Brown, his whereabouts, and an allegation that he was carrying a firearm. While the officers were able to corroborate immediately the identification and location components of the tip, at no point before Officer Lewis ordered Brown against the car did the officers observe any conduct by Brown that would cause them to suspect that

he was carrying a firearm. *See J.L.*, 529 U.S. at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person."). Moreover, nothing in the record indicates either a history of reliable tips from the anonymous informant or a basis for the informant's knowledge on this occasion. Therefore, regardless of whether a seizure occurred during the initial encounter between Brown and the officers, or whether a seizure did not occur until Brown submitted to Officer Lewis' order, the anonymous tip alone did not provide reasonable suspicion to justify seizing Brown. Because the officers had acquired no additional information that Brown was carrying a firearm before Officer Lewis ordered him against the car, we agree with the district court that the officers lacked authority under *Terry* to seize Brown.

2.

Second, we consider whether the officers had probable cause to arrest Brown for public intoxication, which would have authorized a search incident to his arrest. Under Virginia law, "[i]f any person . . . is intoxicated in public . . . he shall be deemed guilty of a Class 4 misdemeanor." Va. Code Ann. § 18.2-388 (2004). A person is "intoxicated" if he "has drunk enough alcoholic beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior." Va. Code Ann. § 4.1-100 (Supp. 2004).

During his conversation with Officers Lewis and Petrosky, Brown exhibited some outward signs of having consumed alcohol. His eyes were glassy and bloodshot, his breath smelled strongly of alcohol, and he admitted that he had been drinking. The Government argues that these signs were sufficient to give the officers probable cause to arrest Brown for public intoxication. The district court disagreed, finding that Brown "did not exhibit enough physical impairment to justify an arrest for public intoxication." J.A. 111. The district court explained that "[Virginia] courts interpret [§ 4.1-100] to require police officials [to] find some form of mental or physical impairment beyond bloodshot eyes to establish probable cause." *Id.* The Government contends that the district court overstated what Virginia law requires for probable cause to arrest for public intoxication. The Government notes that while the Virginia Supreme Court has held that the strong smell of

alcohol alone is not enough to show that someone is intoxicated, *see Hill v. Lee*, 166 S.E.2d 274, 276 (Va. 1969), no Virginia case has held that physical impairment is required to establish probable cause.

We agree with the Government that no Virginia case has held expressly that physical impairment is required for probable cause under Va. Code Ann. § 18.2-388. However, it is equally true that no Virginia case has held that probable cause may be established without evidence of physical impairment. Additionally, while we acknowledge that § 4.1-100 is framed in the disjunctive, suggesting that a person is intoxicated if he has consumed enough alcohol to affect only his "general appearance" and not his physical movements or speech, we find it significant that in every reported Virginia decision in which the court found probable cause to arrest a person for public intoxication, there was evidence that the person had consumed enough alcohol to impair his physical movement or speech. *See Clagett v. Commonwealth*, 472 S.E.2d 263, 268 (Va. 1996) (defendant was unconscious outside apartment complex); *Fierst v. Commonwealth*, 173 S.E.2d 807, 809-10 (Va. 1970) (defendant was slumped in his vehicle with his head leaning back on the seat); *Clarke v. Commonwealth*, 527 S.E.2d 484, 489 (Va. Ct. App. 2000) (officer "detected the odor of alcohol on [defendant], observed his bloodshot eyes, and noted his erratic speech").[7] Moreover, our research has uncovered, and the Government has cited, no published opinion of the Virginia appellate courts finding probable cause for public intoxication based solely on glassy, bloodshot eyes and the strong smell of alcohol.

During the exchange between Brown and the officers, Brown showed no signs of physical impairment caused by alcohol consumption. As no Virginia case has ruled that probable cause can be estab-

---

[7]We emphasize that these cases were probable cause cases and not those involving proof by a preponderance of the evidence or beyond a reasonable doubt. *Cf. Hill*, 166 S.E.2d at 276 (finding evidence that defendant smelled of alcohol and admitted to having consumed alcohol insufficient to prove by a preponderance that defendant was intoxicated); *Farren v. Commonwealth*, 516 S.E.2d 253, 256 (Va. Ct. App. 1999) (finding evidence that defendant was driving erratically, smelled of alcohol, and had to lean on car for balance sufficient to sustain criminal conviction for driving under the influence).

lished without physical impairment, we decline to expand Virginia law ourselves. We hold, therefore, that Officers Lewis and Petrosky lacked probable cause to arrest Brown for public intoxication. The arrest was illegal, and its fruits—including the firearm and statements made in the patrol car—were properly suppressed. *See Taylor*, 457 U.S. at 694; *Wong Sun*, 371 U.S. at 484-86.

### III.

For the reasons stated above, we find no error in the suppression of the firearm and statements. We therefore affirm the decision of the district court.

*AFFIRMED*

NIEMEYER, Circuit Judge, dissenting:

Because I conclude that the police in this case had probable cause to arrest Everett Oshae Brown for both public intoxication and illegal possession of a firearm, I would reverse the district court's order granting Brown's suppression motion.

Newport News, Virginia police received an anonymous tip at about 9:30 p.m. on September 6, 2003, that a short, black male wearing glasses was carrying a handgun outside Building 4 of the apartment complex at 360 Roseman Court. When two police officers responded to the call within a few minutes and investigated, they found Brown outside of the designated location and fitting the description.

The officers, who acted cautiously and deliberately throughout the entire encounter, told Brown of the tip and asked him if he would consent to a pat-down for weapons. Brown refused. To the officers, Brown appeared intoxicated. His breath carried a "strong odor" of alcohol, his eyes were bloodshot and glassy, and he was "fidgety and nervous." When the officers asked Brown if he had been drinking, Brown admitted that he had been.

Believing that the anonymous tip revealed a public risk that Brown was carrying a concealed weapon but recognizing that the tip alone

might not be a sufficient basis on which to arrest Brown, the officers acted on what they perceived to be Brown's public intoxication and later acknowledged that they had an intent to arrest him on that basis. While the officers did not tell Brown he was under arrest, the officers testified that "for [their] safety, [they] *asked* him to place his hands on the car that was directly in front of him." (Emphasis added). After one officer told Brown to place his hands on the car, the other officer observed a gun in Brown's back pocket. As that officer testified:

> [Brown] started to bend over to place his hands on the car. When he bent over, I noticed in the pants that he was wearing, on the left rear pocket of his pants I noticed this bulge that was in the shape of a gun. So immediately to me I knew he had a gun in his left rear pocket.

The officer then drew his weapon and "*ordered* [Brown] to place his hands on the car." (Emphasis added). Both officers testified that they had to tell Brown repeatedly to place his hands on the car. After the officers removed the handgun from Brown's pocket, they placed him under arrest and handcuffed him. After arresting Brown, the officers charged him with both public intoxication and illegal possession of a firearm.

The majority finds fault with the officers' conduct in arresting Brown for public intoxication because, in their view, the officers did not have probable cause to believe that Brown was violating Virginia's public intoxication law, Virginia Code Annotated, § 18.2-388. Under that law, a person is intoxicated if he "has drunk enough alcoholic beverages to observably affect his *manner*, *disposition*, speech, muscular movement, *general appearance* or behavior." Va. Code Ann. § 4.1-100 (emphasis added). Although the majority agrees that Brown's general appearance was observably affected by his alcoholic consumption because he smelled strongly of alcohol, his eyes were bloodshot and glassy, and he was fidgety and nervous, the majority declines to recognize that the officers' observations gave them probable cause to believe that Brown was violating Virginia's public intoxication statute. Rather, the majority concludes, illogically I submit, that because it could find no case to support a holding that any officer observing these conditions had probable cause, the officers in this case did not have probable cause. Moreover, the majority concedes

that it could find no case holding that an officer observing a person smelling strongly of alcohol, manifesting bloodshot and glassy eyes, and fidgeting lacked probable cause to arrest the person for violating Virginia's public intoxication law. As the majority reasons:

> [W]e find it significant that in every reported Virginia decision in which the court found probable cause to arrest a person for public intoxication, there was evidence that the person had consumed enough alcohol to impair his physical movement or speech. Moreover, our research has uncovered, and the Government has cited, no published opinion of the Virginia appellate courts finding probable cause for public intoxication based solely on glassy, bloodshot eyes and the strong smell of alcohol.

*Supra* at 13 (citations omitted). At bottom, because the majority could find no Virginia case that authorized a finding of probable cause based on the observations made by the two officers in this case, it somehow feels compelled to conclude that the officers lacked probable cause.

I submit that the fact that no earlier case has decided the issue before us does not mean that the officers lacked probable cause to arrest Brown for public intoxication. To determine whether the officers in this case had probable cause to arrest Brown for violation of the statute, requires an analysis that compares what the officers observed with what the statute prohibits. Such an analysis is conspicuously absent from the majority's opinion, which can only lead to the conclusion that its reasoning is founded on abstraction and not on the law enforcement realities presented to the officers.

The Virginia public intoxication statute makes public intoxication a misdemeanor. *See* Va. Code Ann. § 18.2-388. And for purposes of that statute, a person is intoxicated when he has consumed a sufficient amount of alcohol "to observably affect his manner, disposition . . . [or] general appearance," among other things. *Id.* § 4.1-100.

It is undisputed that Brown consumed alcohol and that the officers personally witnessed a strong odor of alcohol coming from his breath and observed his bloodshot and glassy eyes, and his fidgety demea-

nor. Rather than simply *believing* that he was intoxicated, the officers actually concluded from their personal observations that Brown was intoxicated. As one officer testified:

> Q. Okay. You didn't ask what he had been drinking in what quantities, did you?
>
> A. No, I did not.
>
> Q. Would that have been important to you to determine whether he was drunk?
>
> A. Not necessarily for a drunk in public, no.
>
> Q. Well, you indicated that there was no unsteadiness on his feet and just a slight slur in his speech, and you made a determination he was drunk on that basis?
>
> A. With the bloodshot and glassy eyes as strong as the odor was coming from his breath, yes, I did.

As the officer properly observed, she did not have to determine that Brown was actually intoxicated; she only had to have a reasonable belief that he was intoxicated. Yet, in this case, the officer believed that Brown was in fact intoxicated.

"[P]robable cause to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a *prudent person*, or one of reasonable caution, *in believing*, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979) (internal quotation marks omitted) (emphasis added). But as the Supreme Court has observed, probable cause is judged "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It is a "fluid concept" that turns on "the assessment of probabilities in particular factual contexts," not on any formula such as is applied to proof at trial. *Id.* And in reviewing the officer's finding of probable cause, "we defer to the expertise and experience

of law enforcement officers at the scene." *United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004) (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

It is readily apparent that the majority has not deferred to the expertise of the police officers at the scene in this case, who not only articulated the necessary statutory manifestations of intoxication to find one guilty under Virginia's public intoxication law, but also gave their opinion that Brown was actually intoxicated. Applying the prescribed and straightforward analysis for determining probable cause, I would conclude as a matter of law that the officers had probable cause to arrest Brown for public intoxication.

The majority also rejects the discovery of a gun in Brown's pocket as an additional reason for his arrest because, it concludes — contrary to the officers' testimony — that the gun was observed *after* Brown had already been arrested. Again, I disagree.

While the events did occur quickly, both officers agreed that they observed the gun *before* Brown was ever touched by them; *before* Brown was handcuffed; and *before* Brown was told he was under arrest. As the officer who discovered the gun testified, Brown had "*started* to bend over to place his hands on the car" when "I noticed this bulge that was in the shape of a gun." (Emphasis added). He testified further, "So immediately to me I knew he had a gun." At this point, the officers had only made a request that Brown place his hands on the vehicle for the officers' safety, and Brown *was only starting* to comply with that request. The events that then occurred, however, suggest that Brown had not yet been secured and that the officers could not conclude that Brown was going to comply with their request.

The majority argues that because (1) Brown was requested to place his hands on the car for the officers' safety and (2) he was "starting" to submit to the officers' requests, he was already under arrest when the gun was observed. Yet the majority does not suggest that either officer had touched Brown, or that Brown was precluded from fleeing. Moreover, neither officer felt sure that Brown was accommodating their request, as he repeatedly had to be told to place his hands on the car. Indeed, the request changed to a command only after one

officer saw the gun and stated that he "ordered" Brown to place his hands on the vehicle.*

---

*Disagreeing with the majority's summary of the record in footnote 5 of its opinion, I respectfully suggest that the record consistently reveals that no "commands" or "orders" were made of Brown *before* Officer Petrosky observed the handgun in Brown's rear pocket. Officer Lewis, who was conducting the discussion with Brown before his arrest, testified, "For our safety, I *asked* him to place his hands on the car." J.A. 51 (emphasis added). She, however, was not the one who first observed the handgun in Brown's pocket, and she did not understand why, as she was making the request of Brown, Officer Petrosky drew his gun and began *ordering* Brown to put his hands on the car. Officer Lewis testified that as she made the request to Brown to place his hands on the car, Petrosky "immediately" drew his weapon and "*order[ed]*" Brown to keep his hands on the car. *Id.* (emphasis added). According to Lewis, therefore, the *order* (given by Officer Petrosky) to Brown followed Officer Petrosky's drawing his weapon on observing the handgun in Brown's rear pocket. *Id.*

Testifying to the same moment, Officer Petrosky stated, Officer Lewis "*told Mr. Brown to go ahead and place* his hands on the car." J.A. 34 (emphasis added). Officer Petrosky testified further that as Brown "*started* to bend over," he observed the handgun in Brown's pocket. *Id.* (emphasis added). At that point, according to Officer Petrosky, "I drew my weapon. I pointed it at Brown, and I *ordered* him to place his hands on the car." *Id.* (emphasis added).

According to the majority, the statement that Lewis "told [Brown] to go ahead" was the equivalent of giving Brown an order. This is shown, the majority contends, by Officer Petrosky's testimony, "I was still *ordering* him to place his hands on the car." J.A. 35. Officer Petrosky testified, however, that when he stated he was *still ordering* Brown to place his hands on the car, he had already seen Brown's handgun; he had drawn his gun; and he had already once *ordered* Brown to place his hands on the car. J.A. 34-35. It was after Officer Petrosky's show of authority by drawing his gun and issuing *orders* that Brown became nervous and failed to comply with the orders, requiring the officers to seize him physically and to secure him in handcuffs.

Apart from my disagreement with the majority's characterization of the record, the more important aspect of footnote 5 is the majority's continuing misapprehension of the analysis that must be undertaken in these circumstances. The majority argues that "the entire record demonstrates

In these circumstances, I respectfully submit, Brown was not arrested until the officers had secured him. *See California v. Hodari D.*, 499 U.S. 621, 626, 629 (1991) (noting that a defendant who does not submit to the show of authority or who flees the police in response to a show of authority has not been seized in a constitutional sense). Thus, before the officers seized Brown, they discovered the gun about which they had received the tip, giving them an additional ground to arrest Brown.

From any objective analysis of the record, the conduct of the officers in this case was careful, nuanced, and legal, and they complied in every sense with the restrictions imposed by the Constitution, while *fully* recognizing their need to protect the community. As the Supreme Court has observed, while the Fourth Amendment is designed to protect "citizens from *rash and unreasonable interferences* with privacy and from unfounded charges of crime," it is also designed to give "*fair leeway [to officers]* for enforcing the law in the community's protection." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949))

---

that Brown did not have the option of refusing Officer Lewis' 'request,'" *supra*, at n.5. This statement betrays the majority's reliance on the "show of authority" test that the Supreme Court has held is not "sufficient" to decide whether a seizure has occurred in circumstances such as those before this court. *See California v. Hodari D.*, 499 U.S. 621, 628 (1991).

In *Hodari D.*, the Court explained that the "show of authority" test — applied by the majority to facts before us —"states a *necessary*, but not a *sufficient*, condition for seizure — or, more precisely, for seizure effected through a 'show of authority.'" 499 U.S. at 628. The Court stated that the show of authority *must produce the seizure*. Thus, when Hodari fled on the show of authority, the Court held that Hodari "was not seized until he was tackled." *Id.* at 629. Likewise, while the officers in this case may have showed authority, the show of authority did not produce the seizure, especially when Brown failed to comply with the orders. Thus, they never seized Brown for Fourth Amendment purposes until they secured him physically.

By not recognizing the difference between a show of authority and a seizure, the majority reaches a result inconsistent with the analysis demanded by *Hodari D.*

(internal quotation marks omitted) (emphasis added). The majority does not afford the officers this "leeway," nor did the district court.

Accordingly, I would reverse.