Filed 11/5/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B310554 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA487710) |
| v. | |
| OSCAR CUADRA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Laura F. Priver, Judge.  Reversed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen and Theresa A. Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Appellant Oscar Cuadra was charged with possession of a firearm by a felon in violation of Penal Code section 29800, subdivision (a)(1). The firearm was seized from his person by the arresting officers. Before pleading no contest, appellant filed a motion to suppress the firearm evidence under Penal Code section 1538.5 as the fruit of an unlawful detention. Appellant contends the trial court erred when it denied the motion. We agree and reverse.

## BACKGROUND

Los Angeles County Deputy Sheriff Xavier Zeas was the only witness at the hearing on the motion. The following evidence was adduced.

At 2:15 a.m. on June 3, 2020, Deputy Zeas and his partner drove their patrol car into the Destiny Inn parking lot in the City of Commerce and stopped next to a parked car appellant was standing near. The parking lot was a narrow strip of asphalt sandwiched between the motel and a fence fronting Triggs Avenue. There were five parking stalls. The lot was so narrow that Deputy Zeas said he was five to six feet from appellant when they encountered each other.

Because of Black Lives Matter protests, there was a curfew in effect. From inside the patrol car, Deputy Zeas asked appellant if he was aware of the curfew. Appellant said no. Deputy Zeas testified he did not cite appellant for a curfew violation because he just wanted to find out if appellant knew about it. Indeed, he testified the curfew did not apply to persons on private property, which is where appellant was standing. Deputy Zeas was correct. (L.A. County Bd. of Supervisors, Chair's exec. order (May 31, 2020) ["No person . . . shall be upon a public street, avenue, boulevard, place, walkway, alley, park or

2

any public area of unimproved private realty within the County between 6:00 p.m. and 6:00 a.m. of the following day."].)

Deputy Zeas then asked appellant if he was on parole or probation. Appellant said he was on probation. Deputy Zeas testified that "at that point" he decided to detain appellant. One might ask, for what? Appellant was standing next to a car in the Destiny Inn parking lot at 2:15 a.m. The two officers exited their patrol car and as Deputy Zeas testified, "at that point . . . we asked him to walk over to the hood of our patrol vehicle." Appellant then raised his hands and started to step backward away from the patrol car, all the while asking why the officers were "attempting to detain" him when he had done nothing wrong. It was after he raised his hands in response to Deputy Zeas that Deputy Zeas saw an unidentified "bulge" in appellant's right front pants pocket. The bulge was "pretty big" and consistent with the shape of a firearm. Before Deputy Zeas could react to what he just observed, appellant "spontaneously" told the deputies he had a gun.

At that point Deputy Zeas ordered appellant to the ground. Appellant complied and was detained. Deputy Zeas performed a pat down search and recovered a loaded .38 caliber revolver from appellant's right front pants pocket.

After entertaining argument, the trial court denied the motion. This appeal followed.

## DISCUSSION

" 'In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable

3

under the Fourth Amendment.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 232; accord, *People v. Brown* (2015) 61 Cal.4th 968, 975 (*Brown*).)

Officers must have sufficient justification under the Fourth Amendment to effect a search and seizure.  There are three distinct types of police-citizen encounters, each requiring a different level of suspicion to be deemed reasonable under the Fourth Amendment:  (1) arrest, which must be supported by probable cause; (2) brief investigatory stops, which must be supported by reasonable articulable suspicion; and (3) brief encounters between police and citizens, which require no objective justification.  (*U.S. v Brown* (2005) 401 F.3d 588, 592; *Terry v. Ohio* (1968) 392 U.S. 1.) It is well settled that "[a]n officer may approach a person in a public place and ask if the person is willing to answer questions. . . .  Such consensual encounters present no constitutional concerns and do not require justification." (*Brown*, *supra*, 61 Cal.4th at p. 974, citing *Florida v. Bostick* (1991) 501 U.S. 429, 434.)

A consensual encounter may ripen into a seizure for Fourth Amendment purposes " 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " (*Brown*, *supra*, 61 Cal.4th at p. 974, quoting *Terry v. Ohio, supra,* 392 U.S. at p. 19, fn. 16.)  "In situations involving a show of authority, a person is seized 'if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," ' or ' "otherwise terminate the encounter." ' " (*Brown,* at p. 974; *Florida v. Bostick*, *supra*, 501 U.S. at pp. 437–438 [A seizure of a person occurs the moment a reasonable person would not have felt free to leave without responding or yielding to the officer.].)

"The dispositive question is whether, ' "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave . . ." [citation].' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 341.) "The test is 'objective,' not subjective; it looks to 'the intent of the police as objectively manifested' to the person confronted. [Citation.] Accordingly, an 'officer's uncommunicated state of mind and *the individual citizen's subjective belief are irrelevant . . . .' " (*Ibid.*, italics added.)

A seizure may occur by a show of authority alone without the use of physical force, "but there is no seizure *without actual submission*." (*Brendlin v. California* (2007) 551 U.S. 249, 254, italics added.) The test for existence of a show of authority is an objective one: whether the officer's words and actions would have conveyed to a reasonable person that he was being ordered to restrict his movement. (*California v. Hodari D.* (1991) 499 U.S. 621, 628.)

Instructions to put one's hands on the hood of a car has been deemed a show of authority. (*U.S. v. Brodie* (D.C. Cir. 2014) 742 F.3d 1058, 1061; *U.S. v. Brown, supra,* 401 F.3d at p. 595.) By his own testimony, Deputy Zeas began the detention process when he "asked" appellant to come toward the hood of the patrol car. Hearing those words, whether as a "request" or an "order," no reasonable person would feel free to leave. It is objectively apparent the officers intended to detain and frisk appellant. Why else would they have instructed him to move to the hood of their patrol car? And appellant, by his question, reasonably understood that he was being detained. That appellant raised his hands and stepped backward is not, by any stretch of the imagination, an indication that he believed he was not being

5

seized and was, instead, free to leave.  Indeed, the People, in their briefing, state: "Admittedly, when the deputies exited their car and asked appellant to approach their car, a reasonable person in those circumstances would have believed that he was not free to leave or otherwise terminate the encounter."

Nevertheless, relying on *California v. Hodari D.*, the People argue there was no detention because appellant did not actually submit to the officers' show of authority.  Instead, he raised his arms and stepped back, conduct which the People contend is noncompliance.  We disagree.  Generally, people do not put up both hands and step back while still facing the police if they believe they can just walk away.  They walk away.  Raising one's hands and stepping back is a universally acknowledged submission to authority.  It is an accepted way to reassure someone who is armed and confronting you that you pose no threat because you have no weapon in hand, your arms are not poised to attack, and you are not advancing in a menacing way.  By putting up both hands appellant yielded to the officers' show of authority.  To press the point, the record discloses no evidence from which one might infer that appellant's compliance was feigned.  Once he put up his hands, he continued to submit to the officers' demands.  (Cf. *U.S. v. Brodie, supra,* 742 F.3d at p. 1061 [defendant who complied with order to put hands on hood of car and then immediately fled still found to have submitted to the officers' show of authority; later acts of noncompliance do not negate defendant's initial submission, so long as it was authentic].)

6

The observation of the bulge in appellant's pocket occurred as a result of appellant's submission to authority. As Deputy Zeas put it, "when he raised his hands in the air, that revealed a bulge in his front right pants pocket."

We conclude that there was neither probable cause to arrest appellant but for the illegal detention, nor was this a consensual encounter after the officers directed appellant to the hood of the car. As for a brief investigatory stop under *Terry v. Ohio*, there must be an objective manifestation of a reasonable articulable suspicion that criminal activity is afoot and that appellant was a person engaged in, or about to engage in, criminal activity. (*People v. Souza* (1994) 9 Cal.4th 224, 230.) Here there was neither. All the officers knew was that appellant was standing next to a car in a motel parking lot at 2:00 a.m. And without knowing whether defendant's grant of probation included a search condition, the officers could not ultimately stop and search him as they did. (*In re Jaime P.* (2006) 40 Cal.4th 128, 139.)

Under the totality of circumstances, we conclude appellant submitted to a show of authority and his detention was not founded on reasonable suspicion, consent, or probable cause to arrest. The stop does not pass constitutional muster and the revolver seized as a result of the search should have been suppressed.

## DISPOSITION

The judgment of conviction is reversed.

## CERTIFIED FOR PUBLICATION

STRATTON, J.

I concur:

WILEY, J.

8

**GRIMES, J., Dissenting.**

I respectfully dissent. The record shows substantial evidence of a reasonable basis for engaging in the consensual encounter which led to an attempted detention and, moments later, a successful detention. Deputy Xavier Zeas and his partner approached defendant because he was standing in a motel parking lot, after midnight, two days after Los Angeles and several other Southland cities had imposed a curfew from 6:00 p.m. to 6:00 a.m., which remained in effect at the time of this encounter. I agree with the trial court it is important to acknowledge the context; there was great unrest throughout our county in the wake of the looting that followed the Black Lives Matter protests. National Guard troops and police officers guarded the barricaded steps of Los Angeles City Hall and tried to restore order in Santa Monica and Long Beach. For two days, looters spent hours vandalizing and breaking into stores, stealing items and setting fires in Los Angeles, Santa Monica, and Long Beach. Hundreds were arrested on suspicion of burglary, looting, vandalism, failure to disperse, and firearms and curfew violations. Five LAPD officers were injured, with two of them hospitalized. (Reyes-Velarde et al., *Looting hits Long Beach, Santa Monica as countywide curfew goes into effect*, L.A. Times (May 30, 2020, rev. June 1, 2020) <https://www.latimes.com/california/story/2020-05-31/looting-vandalism-leaves-downtown-l-a-stunned>[as of Nov. 4, 2021], archived at <https://perma.cc/J3V2-9LHT>.)

In the midst of this turmoil, Deputy Zeas and his partner were on patrol in the early morning hours of June 3, 2020, when they saw defendant standing in the motel parking lot, next to a parked car. The deputies remained inside their patrol car while

1

Deputy Zeas asked defendant if he was aware of the curfew. Defendant said no. Deputy Zeas asked defendant if he was on parole or probation. Defendant said he was on probation. Deputy Zeas testified that "at that point" he decided to detain appellant. The majority poses the question, "One might ask, for what?" I think in considering this encounter in context, it was reasonable under the circumstances for the deputies to think they should inquire about defendant's presence outside that night.

In the days before this encounter, images of the violence and looting had filled the media nonstop. Perhaps it was true defendant did not know about the curfew, as he told the deputies, though that seems unlikely. Deputy Zeas testified he did not decide to detain defendant for a curfew violation; and there may have been no curfew violation, because defendant was on private property. But I do not find it was unreasonable for Deputy Zeas to form a plan to detain defendant.

More to the point, however, I do not agree with the majority that the deputies did in fact detain defendant when they got out of the patrol car and asked defendant to come toward the front of the patrol car. Defendant did not do so. Rather, defendant raised his hands in the air and started backing away from the deputies, asking why they were "attempting to detain" him when he had done nothing wrong. When defendant raised his hands, Deputy Zeas noticed a large bulge in defendant's right front pants pocket. Before Deputy Zeas could respond, defendant "spontaneously" told the deputies he had a gun.

I agree with the majority there was a show of authority when the deputies got out of the patrol car and asked defendant to approach the front of their vehicle. At that point in the otherwise consensual encounter between the deputies and

2

defendant, a reasonable person in defendant's position would not have felt free to leave. However, I disagree the record shows defendant submitted to that authority. In my view, there was an attempted seizure only, and the detention did not occur until defendant subsequently complied with the deputies' demand to get down on the ground.

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ' "by means of physical force or show of authority," ' terminates or restrains his freedom of movement, [citations], 'through means intentionally applied.' " (*Brendlin v. California* (2007) 551 U.S. 249, 254; italics omitted (*Brendlin*).) Of particular relevance here, "[a] police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission." (*Ibid*.) *Brendlin* tells us that when a defendant does not submit to a show of authority, "*there is at most an attempted seizure*, so far as the Fourth Amendment is concerned." (*Ibid*., italics added.)

Whether there has been a submission to a show of authority is judged under a totality of circumstances test. (*Brendlin*, *supra*, 551 U.S. at p. 255.)

The majority says that defendant yielded to the deputies' show of authority by raising both of his hands, which they characterize as a "universally acknowledged submission to authority." I agree that whenever anyone says, "Put your hands up or I'll shoot," the raising of hands conveys submission. But I cannot agree that is unquestionably evidence of submission that gives rise to the majority's reduction formula: in assessing human behavior, raised hands always = submission. Defendant did not say, "Please don't shoot," or "I give up." I find it more

3

reasonable to infer from the circumstances of this case that defendant raised his hands in protest, or in a "What's up with you?" gesture, which is consistent with defendant's words in protest that he had done nothing wrong, so why are you trying to detain me.

At no point did defendant approach the car and place his hands on the hood as the defendant did in *United States v. Brodie* (D.C. Cir. 2014) 742 F.3d 1058, 1061. Deputy Zeas and his partner had not drawn their guns, were not acting aggressively, and defendant was not cornered. In fact, defendant was standing in an unfenced portion of the parking lot. Deputy Zeas testified that "pedestrian foot traffic [could] come and go as they please" at that location. Defendant was in a position to flee or simply walk away and nothing in his behavior indicated he had ruled out either option. (See, e.g., *United States v. Huertas* (2d Cir. 2017) 864 F.3d 214, 216-217 [affirming denial of motion to suppress, finding no submission to authority where the defendant momentarily stopped and answered question from officer in patrol car, but then fled as soon as the officer got out of the car and attempted to continue the encounter].)

When defendant backed away and raised his hands, a bulge in his pants pocket was revealed. The record does not suggest either deputy said or did anything in reaction to seeing the bulge. Neither deputy asked defendant if he had a gun in his possession. They did not draw their guns. One can reasonably infer defendant saw Deputy Zeas's eyes fix on the bulge in his pocket, and that was why he then blurted out that he had a gun. At that point, the deputies had reasonable suspicion to detain defendant. The deputies immediately told him to lay on the ground.

4

Defendant complied with this second show of authority, and the detention occurred at that time.

I would affirm the denial of defendant's motion to suppress.


GRIMES, Acting P. J.