<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 14-4283**

───────────

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

LAVELLE DEWAYNE STOVER,

                    Defendant - Appellant.

───────────

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Paul W. Grimm, District Judge.  (8:13-
cr-00347-PWG-1)

───────────

Argued:  September 17, 2015          Decided:  December 18, 2015

───────────

Before MOTZ, KING, and GREGORY, Circuit Judges.

───────────

Affirmed by published opinion.  Judge Motz wrote the majority
opinion, in which Judge King joined.  Judge Gregory wrote a
dissenting opinion.

───────────

**ARGUED**: Maggie Teresa Grace, VENABLE, LLP, Baltimore, Maryland,
for Appellant.  Aaron Simcha Jon Zelinsky, OFFICE OF THE UNITED
STATES ATTORNEY, Baltimore, Maryland, for Appellee.  **ON BRIEF:**
James Wyda, Federal Public Defender, Baltimore, Maryland, Paresh
S. Patel, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt,
Maryland, for Appellant.  Rod J. Rosenstein, United States
Attorney, Baltimore, Maryland, Kelly O. Hayes, Assistant United
States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Greenbelt, Maryland, for Appellee.

───────────

DIANA GRIBBON MOTZ, Circuit Judge:

A jury found Lavelle Stover guilty of possession of a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (2012). On appeal, Stover challenges the district court's denial of his motion to suppress the firearm as the fruit of an illegal seizure. For the reasons that follow, we affirm.

I.

In the early morning hours of March 13, 2013, uniformed Prince George's County Police Officers Justice Halsey and Jesus Yambot patrolled the "King Sector" of Temple Hills, Maryland, an area where several violent robberies had recently occurred. Around 1:00 a.m., the officers noticed a Chevy Silverado double-parked in the small private parking lot of an apartment building. The officers could see a man in the driver's seat and a woman in the front passenger seat.

Although Officer Halsey conceded that it was "not suspicious for someone to be sitting in a parking lot," the officers nonetheless decided to return a few minutes later to check on the car. When they did, they again saw the Silverado parked and occupied as before. According to Officer Halsey, the car's Virginia license plates indicated that "the car d[idn]'t belong." Because of the out-of-state plates, the area's "high-crime" reputation, the late hour, and the double-parking, the

2

officers concluded that they had "the right to stop the occupant of the car and see what's going on." Officer Yambot pulled the marked police vehicle into the lot and parked at a 45-degree angle about three feet behind the Silverado, blocking it in. The officers activated their vehicle's emergency lights "to notify [the driver] that [they were] behind him because [they didn't] want to get ran [sic] over." Then Officer Yambot illuminated the driver's side of the Silverado with a spotlight.

As the district court observed, the suppression hearing testimony was "far from crystal clear" as to the exact sequence and timing of the ensuing encounter. Officer Halsey testified as follows. After Officer Yambot parked the police vehicle, Stover, the individual sitting in the driver's seat of the Silverado, opened his door, emerged from the car, and opened the driver's side backseat door to the Silverado. Officer Halsey left the police car and gave Stover "a verbal command to get back inside of the vehicle." Officer Halsey could not see exactly what Stover was doing or if Stover had anything in his hands because Stover was "standing in between both doors" of the Silverado. Stover made no response to Officer Halsey; indeed, he never "acknowledged" the officer. Instead, Stover quickly walked about five or six feet to the Silverado's front hood. To Officer Halsey, this movement away from the police car looked like "flight." Officer Halsey then ran along the passenger side

3

of the Silverado to its hood, where he saw Stover "toss a gun in front of the vehicle." At that point, Officer Halsey pointed his own gun at Stover and ordered him to get back inside the Silverado, which Stover did without a word. The officers retrieved a loaded nine-millimeter Glock from the grass in front of the hood of the Silverado.

Stover did not testify at the suppression hearing. His passenger testified that after the police officers parked and exited their vehicle, Stover very briefly got out of his car but was immediately met by Officer Yambot, who "made both [Stover and his passenger] lay on the ground" before arresting them. The entire incident happened in a very short period of time. According to Officer Halsey, between two and five minutes; according to the passenger, five seconds.

Upon consideration of these conflicting accounts, the district court found the following facts by a preponderance of the evidence. After the police vehicle pulled up, Stover "did, at some point, get out of the car and did open [two] car door[s]," and "did, at some point, beg[i]n to walk to the front of the car." "At some point," Officer Halsey "said, get back in the car and tried to stop the defendant from getting out of the car." When Officer Halsey saw Stover move to the front of the Silverado, the officer "ran to the front of the car with his gun out, and put the gun in the face of the defendant, meeting him

4

in the front of the car." "[I]t was the presence of [Officer Halsey's] gun in the face of the defendant that caused him to acquiesce" and "[t]hat was after [Stover] had dropped the gun." Only after Stover dropped his loaded gun did he comply with police orders and get back in the Silverado.

A federal grand jury indicted Stover on a single count of possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1) (2012). Stover moved to suppress the gun as the fruit of an illegal seizure. In response, the Government did not maintain that the officers had reasonable suspicion to stop Stover. Instead, the Government argued that, under California v. Hodari D., 499 U.S. 621 (1991), Stover did not submit to the police -- and thus was not seized -- until after he dropped his loaded gun, and so abandoned it, at the hood of his car. The district court agreed, finding that Stover did not acquiesce to the "show of authority that had attempted to put him in a seizure" until Officer Halsey met him at the front of the Silverado, gun drawn, and "actually exercised [] control over the defendant." Because Stover tossed his gun prior to complying with the police orders, the district court found the gun had been abandoned before the seizure and so was admissible at trial.

A jury found Stover guilty and the district court sentenced him to 57 months in prison. Stover timely filed this appeal

5

challenging the district court's denial of his suppression motion. When considering a district court's denial of a motion to suppress, we review the court's factual findings for clear error and all legal conclusions de novo. United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002). "When, as here, a motion to suppress has been denied, we view the evidence presented in the light most favorable to the government." United States v. Watson, 703 F.3d 684, 689 (4th Cir. 2013).

## II.

The parties do not dispute that Stover was at some point seized during his interaction with the officers in the parking lot. They do dispute when this seizure occurred. On appeal, Stover no longer contends that he did not get out of his Silverado, walk to the front of the vehicle, and drop his gun there.[1] Rather, he argues that the officers seized him, without reasonable suspicion, at the moment the police vehicle pulled up

---

[1] At the suppression hearing, defense counsel introduced a report of police radio traffic indicating that Officer Yambot reported a suspicious vehicle on his radio only nine seconds before he reported that he had two people in custody. The defense argued that this report showed that "this whole event occurred within nine seconds," which was too short a time for Officer Halsey's version of events to play out. However, at trial, Officer Yambot testified that he did not make the first radio call until after the officers had secured both Stover and the passenger. On appeal, Stover does not challenge that testimony.

6

behind his Silverado, rendering his gun the fruit of an illegal seizure. The Government maintains that the officers did not seize Stover until after he abandoned his firearm in front of his car, prior to submitting to police authority.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This guarantee, however, "does not extend to all police-citizen encounters." United States v. Jones, 678 F.3d 293, 298-99 (4th Cir. 2012). As a general matter, law enforcement officers do not seize individuals "merely by approaching [them] on the street or in other public places and putting questions to them." United States v. Drayton, 536 U.S. 194, 200 (2002). Rather, as the Supreme Court has explained, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Where, as here, physical force is absent, a seizure requires both a "show of authority" from law enforcement officers and "submission to the assertion of authority" by the defendant. California v. Hodari D., 499 U.S. 621, 626 (1991)(emphasis omitted).

To determine whether police have displayed a show of authority sufficient to implicate the Fourth Amendment, a court

applies the objective test set forth in United States v. Mendenhall, 446 U.S. 544 (1980) (plurality opinion). The police have done so "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554; United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989). A court considers a number of factors in resolving whether an officer's conduct would convey to a reasonable person that he is not free to leave. See, e.g., Michigan v. Chesternut, 486 U.S. 567, 575-6 (1988) (listing examples of police behavior that "communicate[] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement," including "activat[ing] a siren or flashers," "command[ing a person] to halt," or "operat[ing] the [police] car in an aggressive manner to block [a person]'s course"); Jones, 678 F.3d at 299-300 (listing various relevant factors). Only if a reasonable person would feel free to terminate the encounter does a court consider the interaction a consensual one to which the Fourth Amendment protection against unreasonable seizures does not apply. See Florida v. Bostick, 501 U.S. 429, 434 (1991).

If an interaction is not consensual, i.e., if a reasonable person would not have felt free to terminate it, then the Fourth Amendment guards against unreasonable seizures. In such cases,

however, the seizure inquiry does not end. The Mendenhall test "states a necessary, but not a sufficient, condition for . . . seizure effected through a 'show of authority.'" Hodari D., 499 U.S. at 628 (emphasis in original). When submission to police authority is disputed, a court must also ascertain whether and when the subject of the seizure actually acquiesced to that authority. Hodari D., 499 U.S. at 628-29; Brendlin, 551 U.S. at 254.

"[W]hen an individual's submission to a show of governmental authority takes the form of passive acquiescence," the relevant test "for telling when a seizure occurs in response to authority" is that enunciated in Mendenhall. Brendlin, 551 U.S. at 255. But, in cases where the individual does not clearly and immediately submit to police authority, courts must determine when and how the submission occurred. See, e.g., United States v. Lender, 985 F.2d 151, 153-55 (4th Cir. 1993). "[W]ithout actual submission" to the police, "there is at most an attempted seizure," which is not subject to Fourth Amendment protection. Brendlin, 551 U.S. at 254; see also Hodari D., 499 U.S. at 626-27 & n.2.

Brendlin does not create a new analysis for determining when and if submission to police authority has occurred. Rather, Brendlin simply applies the analysis set forth in Hodari D. Brendlin, 551 U.S. at 254, 257-58, 261-62. See also

9

Wayne R. LaFave, 4 Search & Seizure § 9.4(d) (5th ed. 2015) (describing how Brendlin uneventfully applies Hodari D.). Thus, Hodari D. established the broad principle that an individual must submit to authority for a seizure to occur; Brendlin teaches that "passive acquiescence" is one form of that submission.[2]

As with the "show of authority" analysis, determining what constitutes "submission" can be a difficult, fact-intensive inquiry. "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." Brendlin, 551 U.S. at 262; see also LaFave, 4 Search & Seizure § 9.4(d) (observing that "lower courts will frequently be confronted with difficult questions concerning precisely when

_____

[2] Hence, our friend in dissent errs in repeatedly stating that Brendlin and Hodari D. set forth different "tests." Moreover, the dissent's even more repeated suggestion that we demand too much in looking to a "signal" of "submission" from Stover seems very odd given the Supreme Court's use of these very terms in assessing submission in Brendlin. See Brendlin, 551 U.S. at 262 (explaining that Brendlin, who had "no effective way to signal submission while the car was still moving . . . once it came to a stop [] could, and apparently did, submit by staying inside")(emphasis added). Although the dissent places great emphasis on the fact that Stover's car was not moving when the police arrived, Stover certainly was not "deprived of the ability to signal submission," as the dissent contends. Rather, Stover could easily have signaled submission in the very way Brendlin did -- or, as discussed below, any number of other ways.

the requisite physical seizure or submission to authority . . . occurs"). If an individual does submit to a show of police authority, and police then discover evidence, the court must assess whether either reasonable suspicion or probable cause supported the seizure. See Terry, 392 U.S. at 20-21.

III.

With these principles in mind, we first consider whether, under the totality of the circumstances in the instant case, a reasonable person would have felt free to leave after the officers pulled up behind Stover's car. See Mendenhall, 446 U.S. at 554. This is necessary because, although in the district court the Government did not contend that the encounter was consensual, on appeal it argues that "a reasonable person would have felt free to leave" when the police arrived. Appellee's Br. at 18. We disagree. Indeed, this is not a close question here, for this is not a case involving a police officer's "polite request for an interview." Gray, 883 F.2d at 322; see also United States v. Brown, 401 F.3d 588, 593 (4th Cir. 2005). Rather, as the district court noted, the police officers' aggressive conduct from the start of their interaction with Stover was "absolutely an effort [] to try to effect . . . a seizure."

11

In Jones, we recently considered whether similar officer conduct would have left a reasonable person believing he was free to leave. There, officers followed defendant Jones' car into an apartment driveway and parked so that the car could not exit. 678 F.3d at 296-97. When Jones emerged from his car and stood by the car door, the police officers "proceeded immediately to speak to Jones" and pat him down for weapons. Id. at 297-98. We reasoned that "when an officer blocks a defendant's car from leaving the scene . . . the officer demonstrates a greater show of authority than does an officer who just happens to be on the scene and engages a citizen in conversation." Id. at 302. In combination with this fact, the officers were armed and in uniform; they proceeded immediately to the driver's side door; and they did not ask if they could speak with Jones. Id. at 300, 303. Instead, they requested that he lift his shirt and allow an officer to pat him down. Id. Under the totality of the circumstances, we held that a reasonable person would not have felt "free to leave or terminate the encounter." Id. at 304.

Jones squarely compels the conclusion that Stover too was not free to leave. Although here the officers did not follow Stover's car into the parking lot, the rest of the Jones factors are present: the officers, who blocked Stover's vehicle, were armed and uniformed and approached Stover immediately, without

12

asking if they could speak with him.  Indeed, in this case, the officers activated their vehicle's emergency lights, trained a spotlight on Stover, and drew their weapons, making this an even clearer case of a police show of authority than Jones.[3]  See, e.g., Chesternut, 486 U.S. at 575-76 (including police use of "flashers" and "display[] [of] weapons" as indications of a show of authority).  No reasonable person in Stover's position would have felt free to terminate the encounter.

---

[3] Our dissenting colleague maintains that "the relevant show of authority made by police consisted solely of turning on the police vehicle's overhead lights and blocking in Mr. Stover's truck."  He can do so only by making new findings of fact.  In his effort to place the moment of seizure earlier, the dissent disaggregates what the district court found to be a continuous series of events that happened rapidly prior to Stover's submission.  In accord with the testimony at the suppression hearing, the court found that in quick succession the officers not only blocked Stover's car, activated their emergency lights, and turned a spotlight on Stover, but also immediately ordered Stover to remain in his car and when Stover disobeyed, ordered him to return to the car.  The court further found that Stover again disobeyed police orders, walked away from his car and the officers with a loaded gun in his hand, which he discarded in brush in front of the car, and then and only then when confronted by an armed officer did Stover submit to police authority.  The dissent invokes Mendenhall to argue that we can consider only the officers' initial actions, but Mendenhall instructs us to "view [] all of the circumstances surrounding the incident."  446 U.S. at 554.  Thus, all of the officers' conduct prior to Stover's submission constitutes the "relevant show of authority."

IV.

Having concluded that the district court committed no error in finding that the officers demonstrated a show of authority sufficient to implicate the Fourth Amendment, we turn to the question of whether the court erred in finding that Stover did not submit to police authority prior to abandoning his gun.

Up and until Stover submitted, "there [was] at most an attempted seizure, so far as the Fourth Amendment is concerned," and the Supreme Court has held that the Fourth Amendment does not protect attempted seizures. Brendlin, 551 U.S. at 254; see also Cty. of Sacramento v. Lewis, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment."). For example, in the seminal Supreme Court decision on submission, Hodari D., the defendant ran from approaching police officers, tossing away a rock of crack cocaine just before an officer tackled him. 499 U.S. at 623. The Court held that, because the defendant had not submitted to police prior to being tackled, he was not seized when he tossed the contraband. Id. at 629. In contrast, the Supreme Court more recently described a car passenger who remained inside the car during a traffic stop as submitting to police authority through "passive acquiescence," and so held the contraband subsequently found in the passenger's possession should have been suppressed. Brendlin, 551 U.S. at 255, 262-63.

14

To be sure, a range of conduct exists between the "passive acquiescence" in Brendlin and the headlong flight in Hodari D. A defendant does not have to remain frozen in order to submit. Nor does he need to bolt from the scene to signal non-submission. Stover argues that he passively acquiesced to police authority by "remaining at the scene." The district court, however, found that a preponderance of the evidence established that Stover did not acquiesce to the police officer's show of authority until after he discarded his loaded gun.

We must view the district court's finding in the best light for the Government, because it prevailed below. Viewed in that light, the evidence shows that instead of remaining seated in his car when the police vehicle approached, Stover exited his car with a loaded gun in his hand. The district court found that Officer Halsey "tried to keep [Stover] from getting out of the car." But Stover walked away from the officers to the hood of his car, despite their orders to "get back in the car." Only after Stover dropped his firearm did he comply with the police orders. For only then, upon seeing Officer Halsey in front of him with a police weapon drawn,[4] did Stover get back in his car

---

[4] In contending that "no reasonable assessment of the facts can support the conclusion that Stover attempted to leave," the dissent refuses to consider the facts in the light most
(Continued)

15

and follow subsequent police orders. On the basis of this evidence, the district court did not clearly err in finding that Stover had not submitted until after he had discarded his loaded gun.

On appeal, Stover relies heavily on three cases in which we reversed the district court's denial of a suppression motion. Jones, 678 F.3d 293; United States v. Black, 707 F.3d 531 (4th Cir. 2013); and United States v. Wilson, 953 F.2d 116 (4th Cir. 1991). Like the case at hand, these cases involve interactions initiated by police without reasonable suspicion. But, unlike the case at hand, in each of these cases the defendant did submit to police authority before the discovery of any contraband. Moreover, none of these cases involve the issue at the crux of this case -- an individual's ambiguous reaction at the outset of a police show of authority.

_____

favorable to the Government -- as we must. On one hand, Stover never testified as to his intent or anything else. On the other hand, Officer Halsey testified at the suppression hearing that he believed Stover might have fled the scene had the officer not confronted him at the hood of the car. Defense counsel specifically asked Officer Halsey: "[D]id you do anything to make [Stover] stop or did he stop on his own?" Officer Halsey responded, "Yes, I did. . . . I ran up in front of him with the gun in his face." Thus the undisputed record evidence is that Stover walked away from the officers with no indication that he would stop of his own volition; indeed, he gave the officers no information whatsoever about what he was doing. The dissent's generous inference clarifying Stover's intentions views the record, at the very least, in the light most favorable to Stover.

16

In Jones, the defendant's submission was undisputed. The Government did not even suggest that the gun it ultimately found on Jones should be admitted because Jones had not submitted to police authority. Rather, Jones' passive acquiescence and submission to police authority were so clear that the Government's only argument was that Jones' submission evidenced a "consensual" encounter, in which Jones "consented" to the search. Brief of the United States at 10-29, Jones, 678 F.3d 293 (No. 11-4268). Thus, whether in fact the encounter was consensual was the only contested issue in Jones.[5] Jones argued that he was not free to go; the Government maintained that he was. As explained above, we agreed with Jones and so held that the weapon the police found on him should have been suppressed. Jones, 678 F.3d at 305.

Nor do Black or Wilson assist Stover. In both, the defendants, unlike Stover, submitted to police authority. After police officers surrounded Black, he responded by being "extremely cooperative," even volunteering his ID, which an officer pinned to his uniform. Black, 707 F.3d at 536-38.

---

[5] In its appellate brief in Jones, the Government cited Hodari D. just once and then for the single proposition that an encounter is consensual only if a reasonable person would feel free "to disregard the police and go about his business." Brief of the United States at 12, Jones, 678 F.3d 293 (No. 11-4268) (internal quotation marks omitted). Hence, Stover's heavy reliance on Jones is misplaced.

17

When, after this cooperation, Black attempted to walk away from the suspicionless stop, police tackled him and then uncovered his gun. Id. at 536. Because Black had submitted to police authority by his "passive acquiescence" prior to the discovery of his weapon, we held that the weapon should have been suppressed. Id. at 537 n.3, 542.[6] Similarly, in Wilson, when police identified themselves and asked to question Wilson in an airport terminal, Wilson provided them with information as to his flight, his identification, and his educational plans, and submitted to a patdown search. 953 F.2d at 118. The officers insisted on asking more questions, attempting to prolong the encounter. Id. Wilson refused and walked away. Id. When the officers nonetheless persisted, ultimately finding illegal drugs in Wilson's coat, we held that the drugs should have been suppressed. Id. at 119-20, 127.

Stover maintains that his walk to the front of his Silverado is akin to the defendants' movements in Black and Wilson. The problem for Stover is that, unlike the defendants in Black and Wilson, he did not submit to police authority at any point before he began that walk. Stover's initial action

---

[6] Attempting to find some support for its preferred holding, the dissent ignores the "extreme[] cooperat[ion] with," and thus submission to, police authority by the defendant in Black. That cooperation stands in striking contrast to Stover's repeated active disobedience of police orders from the outset of the encounter.

18

was not to cooperate with police and answer their questions, as in Black and Wilson. Rather, as soon as the police blocked his Silverado, he left the car, disobeyed a police order to return to the car, and instead walked away from the police with a loaded gun in his hand. Only after he discarded that gun and was confronted by an armed police officer did Stover submit to police authority.

Jones, Black, and Wilson simply do not involve the critical inquiry here: where to draw the line between submission and non-submission in the face of an individual's equivocal reaction to police acts initiating a show of authority. In cases dealing with this issue, we have found dispositive the same indicia of noncompliance present here. For example, in Lender, we found non-submission where the defendant walked away from approaching officers, ignoring their orders, "fumbling with something" at his waist, and halting just before his gun fell out of his pants. 985 F.2d at 153-55. There, as here, the defendant asked "us to characterize as capitulation conduct that is fully consistent with preparation to whirl and shoot the officers." Id. at 155. Similarly, in United States v. Smith, 396 F.3d 579, 581-82 (4th Cir. 2005), we rejected the defendant's argument that he was seized when police activated their emergency lights and blocked his car's exit, because although his car had been stationary, he "proceeded slowly" away when police approached.

19

We concluded that the defendant "was not seized until he finally submitted to [the officer]'s show of authority by stopping at the end of the driveway." Id. at 586 n.5.

Other courts have reached similar conclusions. See United States v. Salazar, 609 F.3d 1059, 1066-68 (10th Cir. 2010) (holding driver not seized when he backed away slowly from police vehicle before obeying trooper's command to get out of his truck); United States v. Jones, 562 F.3d 768, 772-75 (6th Cir. 2009) (holding that, although seizure of seated passengers occurred when police cars "block[ed] in" defendant's car, defendant himself was not seized because he immediately "'jumped out' as though he wanted to run"); United States v. Johnson, 212 F.3d 1313, 1316-17 (D.C. Cir. 2000) (holding that defendant sitting in parked car did not submit to police when he made "continued furtive gestures" including "shoving down" motions "suggestive of hiding (or retrieving) a gun"). Although we do not necessarily adopt the lower standards of submission recognized in some of these cases, they do demonstrate that Stover's contentions would not fare better in other circuits. Indeed, Stover has not cited, and we have not found, a single case where an individual who exits his car holding a loaded gun,

20

ignores police orders, and walks away from police officers was found to have submitted to police authority.[7]

Our holding might well be different if Stover had, for example, remained in his car or dropped his gun and complied with police orders immediately upon exiting his car. See, e.g., Brendlin, 551 U.S. at 262 (holding that passenger in car pulled over during traffic stop submitted "by staying inside" the car); Brown, 401 F.3d at 594 (finding submission when defendant complied with police request to place his hands on a car); United States v. Wood, 981 F.2d 536, 540 (D.C. Cir. 1992) (finding submission when, upon officer's order to stop, defendant stopped and "immediately dropped the weapon between his feet"). These are just a few of the ways an individual might be able to signal compliance. But, under the totality of the facts as found by the district court in this case, we cannot hold that walking away from police with a loaded gun in hand, in

---

[7] Nor does the dissent cite such a case. Instead, it relies on two inapposite cases -- United States v. Lowe, 791 F.3d 424, 433 (3d Cir. 2015); Kansas v. Smith, 184 P.3d 890, 896 (Kan. 2008) -- for the proposition that "[t]o passively acquiesce, Stover merely had to remain at the focal point of the police investigation rather than attempting to flee, evade the seizure, or jeopardize the safety of police." We need not determine whether the conduct described by the dissent constitutes passive acquiescence, because Stover's conduct -- ignoring police orders and walking away with a loaded gun -- hardly establishes that he did not attempt flight, seek to evade or place police safety in jeopardy. Indeed, the Lowe court found that the defendant submitted in part because he did not "reach[] for a weapon" or "turn[] around in an attempt to walk." 791 F.3d at 433-34.

contravention of police orders, constitutes submission to police authority. Since Stover did not accede to police authority until confronted by an armed officer in front of the Silverado, the gun he discarded prior to that time was not the fruit of the seizure, but rather, like the cocaine in Hodari D., was abandoned.

With our holding today, we do not disturb our observation in Wilson that "[p]hysical movement alone does not negate the possibility that a seizure may nevertheless have occurred." 953 F.2d at 123. Nor do we hold that an effort to conceal evidence or contraband, by itself, constitutes non-submission. Most importantly, we do not suggest that individuals must comply with unfounded and illegal seizures or face arrest. We simply recognize that, under controlling Supreme Court precedent, when an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not apply.

V.

For the reasons stated above, we find no error in the admission of the firearm. We therefore affirm the judgment of the district court.

AFFIRMED

22

GREGORY, Circuit Judge, dissenting:

The majority has forthrightly stated the test that applies to this case: "[U]nder controlling Supreme Court precedent, when an individual attempts to evade a seizure and reveals evidence or contraband prior to submission to police authority, the Fourth Amendment's exclusionary rule does not apply." Maj. Op. 22 (emphasis added). Its application to the facts presented by this case, however, should guide this Court to a different conclusion than that reached by my colleagues in the majority.

Although I do not disagree with the majority's recitation of the facts as such, several significant factual elements should particularly inform the analysis and therefore deserve greater emphasis. These facts are: (1) that the relevant show of authority made by police consisted only of turning on the police vehicle's overhead lights and blocking in Stover's truck; (2) that this was not a normal traffic stop case because Stover's vehicle was already parked when police made this show of authority; (3) that Stover was, at all times, within one to two feet of his vehicle; and (4) that Stover's actions demonstrated a clear intent to abandon his weapon and disarm himself in response to police authority. Similarly, while I do not disagree with the majority's conclusion that under California v. Hodari D., 499 U.S. 621, 623 (1991), a suspect must submit to an officer's show of authority for a

23

constitutional seizure to exist, it is important to note that such submission can take either of two forms: an affirmative signal of compliance or passive acquiescence. Brendlin v. California, 551 U.S. 249, 255 (2007). A more thorough application of this bifurcated legal test,* especially in light of the particular facts I have highlighted, produces a different result and I therefore respectfully dissent.

I.

A.

This case turns on whether the appellant, Stover, failed to submit to the officers' show of authority. The first point of departure between my view and the majority's with respect to this inquiry is, as noted above, that the majority treats this case as it would a run-of-the-mill traffic stop. Doing so results in the application of the submission test from Hodari D., and accordingly the majority places great significance on the fact that Stover did not "signal compliance." Maj. Op. 10

---

*To keep the analysis clear, I will refer to these as different "tests" under the submission inquiry. But I agree with my colleagues in the majority that passive acquiescence is a form of submission and that Brendlin therefore applies Hodari D. rather than articulating a new rule. Maj. Op. 9-10 & n.2. However, passive acquiescence and signaling compliance are sufficiently different forms of submission, requiring us to answer sufficiently different questions, that I do not think calling them different "tests" is inappropriate.

n.2, 15, 21. This, of course, would have been easy had Stover been driving: Just as the suspect in Hodari D. would have been seized if he had stopped running when police gave chase, Stover would have been seized if he had pulled his car over when police pulled behind him with their overhead lights flashing. But Stover was already parked and thus unable to "signal" his submission. Accordingly, the test from Brendlin, not that from Hodari D., must govern.

In Brendlin, police stopped a moving vehicle occupied by a driver and a passenger. While the driver clearly submitted by pulling the car over, the passenger, Brendlin, did nothing to signal submission. Brendlin, 551 U.S. at 252, 255-56. Just like Stover, Brendlin was merely in a car already stopped by the police and therefore "had no effective way to signal submission." Id. at 262. Brendlin was seized just as surely as the driver was, id. at 256-58, but since there was no opportunity for him to signal submission (or any expectation for him to do so), the Court could not use Hodari D. to determine when the seizure began. Id. at 255. The Court therefore recognized that different tests had to be applied to the driver who could signal submission and the passenger who could not. The correct test for the passenger, the Court said, was whether his "submission . . . [took] the form of passive acquiescence," thereby unanimously reversing the California Supreme Court's

25

holding that submission could not occur without an affirmative signal of compliance. Id.; see People v. Brendlin, 136 P.3d 845, 852 (Cal. 2006) (finding that submission did not occur because the "defendant, as the passenger, had no ability to submit to the deputy's show of authority"), vacated sub nom. Brendlin, 551 U.S. 249. The passive acquiescence test clearly applies to Stover under the facts of this case because, although he owned and most likely drove the truck, the vehicle was parked and turned off when the stop began, making his position analytically indistinguishable from that of the passenger in Brendlin.

I must also disagree with my colleagues' conclusion that the verbal commands issued by the police officers, ordering Stover back into the truck, constitute the relevant show of authority for our analysis. The majority repeatedly emphasizes that Stover did not comply with police commands to return to his vehicle. Maj. Op. 13 n.3, 15, 18, 20. However, "[t]he verbal directive from the officers not to leave was not the initiation of the seizure, but rather an affirmation that [Stover] was not free to leave." United States v. Black, 707 F.3d 531, 538 (4th Cir. 2013). The initial show of authority occurred when police pulled their vehicle in behind Stover's with the overhead lights flashing and blocked his vehicle in—and submission to this show of authority would complete the seizure. See Hodari D., 499

26

U.S. at 629 ("Pertoso's pursuit . . . constituted a 'show of authority' enjoining Hodari to halt, [and] since Hodari did not comply with that injunction he was not seized until he was tackled." (emphasis added)). Although it might be tempting to view the police commands as relevant, see Maj. Op. 13 n.3, controlling Supreme Court precedent does not allow us to do so. Brendlin states unequivocally that in a passive acquiescence case, the "test for telling when a seizure occurs in response to authority" comes from United States v. Mendenhall, 446 U.S. 544, 554 (1980), which states that a seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 551 U.S. at 255. Common sense says that occurred when the police pulled behind Stover's vehicle with their overhead lights flashing. United States v. Duty, 204 F. App'x 236, 239 (4th Cir. 2006) (unpublished) ("Winston seized Duty for purposes of the Fourth Amendment when she activated the emergency lights on top of her car and pulled behind the parked car in which Duty was sitting."). Thus, when the police gave their commands that Stover should return to his vehicle, he was already seized (provided Stover acquiesced, which, I will demonstrate, he did according to the majority's own test).

The district court made the same error, and this alone is sufficient to reverse its decision. It incorporated irrelevant

27

facts into its analysis of the submission question by relying on Stover's failure to return to his vehicle as ordered. Moreover, where an individual submits to the initial show of authority, imperfect compliance (or even noncompliance) with subsequent police orders "does not nullify the fact that he initially submitted" and was therefore seized. United States v. Brown, 401 F.3d 588, 595 (4th Cir. 2005) (holding that the suspect remained seized despite repeatedly disobeying orders to place and keep his hands on the car). It is therefore irrelevant that Stover's response to the police orders "may have suggested that he might stop submitting to the officers' assertion of authority and possibly attempt to flee the scene or confront the officers." Id. If the record shows that Stover submitted to the initial vehicular show of authority, it will be established "that when Officer [Halsey] expressly told [Stover] he could not leave, [Stover] was already seized for purposes of the Fourth Amendment." Black, 707 F.3d at 538.

B.

Therefore, the relevant question in this case becomes: Did Stover passively acquiesce to the vehicular show of authority? Supreme Court precedent makes it clear that he did.

In Brendlin, the Court said that when police make a vehicular stop "a sensible person would not expect [the] police officer to allow people to come and go freely from the physical

28

focal point of [the] investigation." 551 U.S. at 257. In other words, controlling precedent says that what the police did in this case—pulling behind a stopped vehicle with overhead lights flashing—amounted to a command not to leave the scene. And no reasonable assessment of the facts can support the conclusion that Stover attempted to leave. To be sure, he exited his vehicle. But the majority acknowledges, as did counsel for the government at oral argument, that a person exiting a vehicle after police have made this show of authority does not, by itself, break or nullify the seizure. To passively acquiesce, Stover merely had to remain at the focal point of the police investigation rather than attempting to flee, evade the seizure, or jeopardize the safety of police. See United States v. Lowe, 791 F.3d 424, 433 (3d Cir. 2015); Kansas v. Smith, 184 P.3d 890, 896 (Kan. 2008).

The majority concludes that Stover was attempting to evade the police seizure. But the factual record makes the purpose of Stover's actions quite clear: He wanted to abandon incriminating evidence. Stover knew he was not supposed to be in possession of a handgun, and he clearly sought to hide that evidence before it was discovered by the police. But abandoning contraband is not inconsistent with passive acquiescence, as the majority itself ably demonstrates. Maj. Op. 21. Stover's conduct may be accurately described as "evasive," but only with

29

respect to the search Stover no doubt anticipated would follow the seizure, and not with respect to the seizure itself.

Evasion with respect to a seizure must necessarily involve an attempt not to be seized, that is, to get away. See Brendlin, 551 U.S. at 262 ("[O]ne sitting in a chair may submit to authority by not getting up to run away." (emphasis added)); see also Wayne R. LaFave, 4 Search & Seizure § 9.4(d) (5th ed. 2015) ("Thus it would appear that if a passenger were to exit the vehicle as soon as it stopped and then fled the scene, the seizure would not 'take' as to him." (emphasis added)). Even if the government's success below prevents us from finding that abandoning contraband was Stover's only motivation for leaving his vehicle, see Maj. Op. 15 n.4, we still lack any evidence that his motivation was to get away. Although I agree with the majority that outright flight is not always required to show non-submission, we must still find that Stover attempted to evade the seizure. According to the majority, we must infer that Stover thought taking a few quick steps towards the front of his vehicle and abandoning his gun would prevent the police from seizing him. That conclusion defies logic. As such, I depart from my colleagues and would find there is no record support for the contention that Stover attempted or intended to flee, evade the seizure, or jeopardize the safety of police.

30

The government's assertion at oral argument that attempting to hide evidence is "another crime" and that committing such a crime precludes our finding submission, Oral Argument 20:20, is also incorrect. The argument depends on conflating evasion of a search with evasion of a seizure, an analytical step that is clearly flawed. After all, if a person is constitutionally seized and then balks at a police request to search his or her person the Fourth Amendment seizure is not automatically terminated. Cf. Black, 707 F.3d at 538 (holding the suspect still seized after he realized he would be searched and attempted to leave). My colleagues in the majority appeared rightly skeptical of the government's argument, and the Supreme Court has clearly demonstrated that it is submission to the attempted seizure that matters. Hodari D., 499 U.S. at 629 ("Pertoso's pursuit . . . constituted a 'show of authority' enjoining Hodari to halt, [and] since Hodari did not comply with that injunction he was not seized until he was tackled.").

Furthermore, I contend that when the contraband at issue is a loaded gun, abandonment should support a finding that the suspect was acquiescing more often than it impedes such a finding, because the suspect has disarmed himself in response to police authority. It would be odd if disarming oneself was taken as evidence of resistance, while remaining armed was taken as evidence of submission. But the majority, like counsel for

31

the government, focuses on the fact that Stover walked <u>away</u> from police with his weapon either in hand or on his person. Would they find it more submissive if Stover had walked <u>toward</u> police armed with a loaded gun? <u>Cf.</u> <u>United States v. Jones</u>, 678 F.3d 293, 298 (4th Cir. 2012) (finding a seizure where the suspect was armed throughout his encounter with police). The direction in which he moved is a technical detail that is clearly irrelevant so long as he remained at the focal point of the investigation without attempting to avoid or resist the seizure itself. The factual record demonstrates that Stover was never more than a couple of feet from the stopped vehicle, that he had no intention of leaving the scene, that he was submitting to being (illegally) <u>seized</u>, and that his evasive conduct was an attempt to thwart the looming police <u>search</u> by hiding evidence that could turn the seizure into an arrest.

Rather than allowing these facts to tell the story of what happened that evening, the majority relies on a strained comparison to our opinion in <u>United States v. Lender</u>, 985 F.2d 151 (4th Cir. 1993), to suggest that a shootout with police was narrowly avoided—a proposition in no way supported by the record. In <u>Lender</u>, the initial (and therefore relevant) show of authority was a police command that the suspect, Lender, stop walking. He did not, instead continuing to walk while reaching for a gun held in his pants. Lender apparently fumbled the

32

weapon, dropping it to the ground, and he then lunged for it as did the officers who were quickly approaching.  Id. at 153-55. We correctly found Lender's "conduct . . . fully consistent with preparation to whirl and shoot the officers," id. at 155, but that is not the case here.

First of all, Lender was a Hodari D. case (it is hard to imagine a case closer to the heartland of that precedent), and this case falls under Brendlin.  Second, the record here is clear:  Stover moved out of view of the police and then tossed his weapon on the ground.  Officer Halsey testified that when he ran up to meet Stover in front of the truck he saw Stover already tossing the gun.  Stover was not raising it to fire, and Officer Halsey specifically testified that Stover never brandished the weapon at the officers.  Whereas Lender went for the gun he unintentionally dropped on the ground, clearly demonstrating a violent intent, Stover intentionally tossed his gun to the ground before Officer Halsey rounded the truck, clearly demonstrating a pacific intent.  The cases are practically opposites.

If this were not enough, it is worth noting that for this Court to decide that Stover was preparing for a shootout, we would need to find that he was a particularly heartless and cowardly individual.  Stover's movements placed Ms. Chinn, a woman with whom he was on a first date, between himself and the

33

police. Perhaps the majority believes the government has demonstrated that Stover was ready to use his date as a human shield, but to me that seems to go beyond our duty to make all reasonable inferences in favor of the government. I believe looking at the evidence objectively forecloses the possibility that Stover was "prepar[ing] to whirl and shoot the officers" and that Lender neither assists the majority nor supports the district court's decision.

Without evidence of flight, evasion, or resistance, on what basis can we conclude that Stover did not submit? The majority's statement that "we do not disturb our observation in Wilson that '[p]hysical movement alone does not negate the possibility that a seizure may nevertheless have occurred'" runs contrary to its analysis. Maj. Op. 22 (quoting United States v. Wilson, 953 F.2d 116, 123 (4th Cir. 1991)). The officers used their vehicle and overhead lights to command Stover to stay in or near the car and await the further intrusions accompanying an illegal investigatory stop. He did so. Officers then demanded he get back in his car, and he did so after walking a short distance around his truck (remaining at the scene and within a foot or two of the vehicle at all times) to abandon a weapon that he anticipated would get him arrested or killed. The majority believes the Fourth Amendment ceased to operate because of these several steps. I cannot agree, and I believe our own

34

precedent and that of the Supreme Court requires a different outcome.

## II.

Once it is established that the case falls under Brendlin, the remainder of the analysis becomes quite easy. Stover passively acquiesced by doing exactly what the Supreme Court said he must do: He remained at the focal point of the investigation without attempting to avoid being seized. As a result, Brendlin tells us, the correct test for determining when he was seized comes not from Hodari D. but from Mendenhall. 551 U.S. at 255. The seizure occurred at the point when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554. I agree with my colleagues that that line was crossed when the police pulled in behind Stover with their overhead lights flashing. Maj. Op. Part III ("[O]n appeal [the government] argues that 'a reasonable person would have felt free to leave' when the police arrived. We disagree." (internal citation omitted)). Because the weapon was both abandoned and discovered after the seizure was complete, I believe the district court's denial of the motion to suppress was in error and that we should reverse.

35

To reiterate, the majority has stated the proper rule for this case, it simply has not applied it in light of all of the relevant facts. Having stated my reasons for dissenting, I now address the position the majority's decision places our Circuit in with respect to other courts. We are not the first circuit to adopt the rule—or perhaps I should say, to articulate the rule—that in light of Brendlin a seizure is accomplished when police make a show of authority that goes unresisted. The Third Circuit has said that "failure to submit has been found where a suspect takes action that clearly indicates that he 'does not yield' to the officers' show of authority. Action—not passivity—has been the touchstone of our analysis." Lowe, 791 F.3d at 433 (citing Hodari D., 499 U.S. at 626). The court went on to note that flight is not the only action that would show resistance and that evasion or threatening behavior would also demonstrate a lack of submission. Id. We would also not be the first court to apply Brendlin's focal point test—the Kansas Supreme Court did so just one year after Brendlin was decided. Smith, 184 P.3d at 896.

Instead of following these well-reasoned opinions, the majority appears to be tacitly influenced by a more troubling precedent from the Tenth Circuit, which in United States v. Salazar, 609 F.3d 1059 (10th Cir. 2010), adopted a "reasonable

36

officer" standard for analyzing submission. 609 F.3d at 1065 ("[W]e consider whether a citizen has submitted to authority by examining the view of a reasonable law enforcement officer under the circumstances."). The majority notes that "[t]o Officer Halsey, [Stover's] movement away from the police car looked like 'flight.'" Maj. Op. 3 (emphasis added); see also Maj. Op. 15 n.4 ("Officer Halsey testified at the suppression hearing that he believed Stover might have fled the scene had the officer not confronted him at the hood of the car."). The majority goes on to cite several inapposite cases from our sister circuits, each of which employs the perspective of the officers or conflates evasion of a search with evasion of a seizure. Maj. Op. 19-20. Salazar is among these. I take only limited comfort from the majority's statement that "we do not necessarily adopt the lower standards of submission recognized in some of these cases." Maj. Op. 20 (emphasis added). The Tenth Circuit has offered no analytical basis for its "reasonable officer" rule (aside from an assertion that objective rules are preferred for Fourth Amendment questions, Salazar, 609 F.3d at 1064), and I can find no other circuit that has adopted the test explicitly. We should not be the first. Indeed, we must not be, as the Tenth Circuit's test flies in the face of our own precedent in Brown which, as discussed above, found it irrelevant that a suspect's

behavior "may have suggested that he might stop submitting to the officers' assertion of authority."  401 F.3d at 595.

Fortunately the majority's opinion does not, and cannot, adopt the "reasonable officer" test.  The test does not deserve the slightest credence.  I hope my words of caution will keep us tightly moored to our precedent in <u>Brown</u>, and that no <u>en banc</u> panel ever drifts to such a standard in the future.